Gibson, the court appreciates your willingness to accept the appointment in this case under the Criminal Justice Act, and you may proceed. Thank you, Your Honor. May it please the court, this appeal comes before the court after my client, Pamela Alloway, entered a conditional guilty plea to a weapons use of a firearm and a drug offense under 18 U.S.C. section 924. Part of the plea bargain is that we were allowed to appeal the rulings of the magistrate and the district court denying a motion to suppress arising from a search of my client and her co-defendants' farmhouse in rural Nottaway County up in northwest Missouri. This case is a little, it's actually quite unusual in that the main issues in this case have to do with factual findings, and our view that although it's a difficult burden to show clear error in these circumstances, there are some really glaring issues that were totally ignored by both the magistrate judge and the district court in finding that the consent to the search was voluntary, and as to the scope of the consent was whether that was exceeded. I think it's clear that under the Poe case and the McMullen case from this court that I cited in the brief that a trial court or magistrate must consider the totality of the circumstances in determining whether the initial consent was valid and whether the officers after they are given limited consent can search other areas of a residence. Probably the most glaring issue, and it's certainly topical now with all the things going on about police shootings and things of that nature, is that it was undisputed that both officers were wearing body cameras. Officer Bragg never turned his camera on at all, and Officer Kochenauer, I guess Deputy Sheriff Kochenauer, testified that there was about a 30-minute gap from the time he and the other deputy. Counsel, what inference are we supposed to take from that? Well, I think there are a couple of inferences. I think it certainly affects the overall credibility of the officer. Okay. And what case stands for that proposition? There really isn't, that I could find, not in this context, but I think the best analogy I can think of would be a situation where if you've got an interrogation and are challenging whether or not the in-custody suspect was given Miranda warnings, and there's a law requiring taping of suspect interrogations if the officer doesn't turn on the tape until after he says the person was Mirandized, and then the prisoner, the person in custody says he never gave me the warning. So I think you, certainly under those circumstances, the adverse inference rule has been applied in a lot of contexts in the criminal system, for instance, in failing to call a witness that would be peculiarly available to one side or the other. Under Missouri law, you can draw an adverse inference from that in your argument to the jury. And I think in this context, neither the magistrate or the district court in upholding the magistrate's report made any mention of it whatsoever. The only credibility findings was in a footnote in the second page of the opinion, and basically the magistrate, Moffmer, said generally if there's disputes, I find in favor of the officers, but didn't really elaborate on anything. But I think that's really a significant error, and I think under the totality of the circumstances test that undermines their case. The other thing that's really glaring is one of the big issues in the case was where the guns were actually found in the farmhouse. Counsel, let me ask you about that. That's my concern with this case. How can we apply our standard of appellate review if there's no factual finding in the record as to where the guns were actually located? Well, I think if you look at Judge Sachs' order adopting the magistrate's report, he makes a finding that the guns were in the kitchen, but doesn't really explain why, because the magistrate never made that finding. He just basically said at the beginning, the officer observed these three rifles up against the wall by a door, but he didn't say whether it was in the kitchen or the living room, which that's a significant issue. But I think the big thing that calls that into question was that neither the body cam footage from after Deputy Kochenow turned on his camera doesn't show where the guns were. The guns are nowhere to be found, and they took crime scene photos, including in the kitchen, and the guns were not depicted on any of the photos. So I think that certainly was an omission that really undermines that conclusion. I suppose the court has the option, rather than an outright reversal, to remand the case for further findings, if you deem that appropriate. But I think there's just too many issues that were just totally not addressed that I contend really undermines the officer's credibility and actually supports my client's testimony that the officer, assuming he was given the consent to come into the kitchen to observe the social worker, interview the children, that he certainly didn't have permission to go snooping around in the living room and in the bedroom, which is different rooms of the house. And that's something that I think deserved to be addressed. There's a couple of other issues that I brought out in the suppression hearing that were not addressed either in that the hotline call about the welfare of the kids was made at eight o'clock at night. They didn't go there until 10.30, but this was on an Easter Sunday at 10.30 at night. The hotline statute, section 210.145, states that the DFS, or Division of Family Services, has to investigate any allegation, hotline allegation, within 48 hours unless there's a determination that, given the circumstances of the call, there's an immediate danger to the children. Both officers testified that this was not an emergency situation, and they had no explanation as to why they had to go out there at 10.30 on an Easter Sunday and couldn't wait until the next morning. Okay, counsel, same question. So what inference are we supposed to take from that? I think that's something that should have been taken into account by both the courts below in assessing the totality of the circumstances. To what end? I mean, what relevance does that have? I think it undermines their, what that has, that has relevance because that indicates that the officers went there for the reason to try to, with the information they got, they were looking for guns and drugs, and that's. Well, what does the record show? Didn't the call come in to the social services employee, and she requested, I think it was a she, I don't remember, requested police assistance at that point? Yes. Yes. And. So are you, okay. But yeah, and sort of a related issue is that it came out that these two deputies were the only deputies on duty that night in the entire 878-square-mile county, and why both of them were there. And while the one deputy went in, the other one was looking around in the sheds and outbuildings looking for evidence of drugs or guns. But I think it's pretty clear that the findings just, you know, didn't really address the totality of the circumstances. And it seems to me that you have a couple of options short of outright reversal, which would be just to remand for further findings on those issues. And I see that my time is up. I'll reserve the rest of my time for rebuttal. Thank you. All right. Very well. All right, Mr. Coffey, you may proceed. May it please the court. My name is Phil Coffey, and I represent the government in this case. Before I forget, the statute that he quotes, and he quotes it in his brief, says 24 hours, not 48. And it doesn't require, it's not a 24-hour waiting period. It says they have to investigate within 24 hours. And they're there because the DFS worker wanted them there. She's the one that decided. I'm sure she had better things to do on a Sunday evening than go out and investigate, but she got the call, and she wanted to go out, and she wanted them for protection. How that affects their credibility, I don't know, but let's Counsel, would you agree that the scope of the consent given by the homeowner was limited by the purpose for the visit? Limited by the purpose, yes, and I'll get to that, because I don't think it gave them the right to just rummage through, but clearly, it would have given them the right to like accompany the social worker. And there was a dispute as to where the interview took place. That was one of the facts that was in dispute, because she testified that it was in the kitchen, which as you'll see on the video, is pretty small. They said no, it was in the living room, where by the way, in the video, you see the kids later on. Now admittedly, we don't have the video turned on until like 20 minutes into, maybe later, and I agree. So as long as the guns were within plain sight of some place that the officers had permission to be, there's no problem here, is there? That's what I'm saying. But isn't there a missing key factual finding here from the district court? We don't know where the guns were found. There's nothing in the record that tells us as an appellate court where they were found so that we can assess whether there's extrinsic evidence that would contradict the credibility determination, which is nearly unassailable otherwise. Okay. Yeah. The answer to that, Judge, is found in the proposed findings of fact, which were adopted by the judge. And in those findings of fact, I have them in here, the proposed finding 10, upon entering the home, Deputy Kokanar observed multiple rifles, long guns, leaning up against doors. And it cites to the record where he says that when he entered, he saw those immediately near the refrigerator. The argument here, and let's, let me step back for a minute. The first argument is, is that they didn't have permission to enter. That's refuted by her own testimony. So we know that part is wrong. And what I find interesting, that is, it's like, believe her testimony when she says I can find them to the kitchen, but don't believe her testimony when she said, I let them in because she said, I said they could come in. Now, one of the, the only person that was denying entry was the dog. He did not like Deputy Bragg for some reason and wouldn't let him in. He let the other two in and I, it's not clear from the record, but apparently he was tied up or chained up, but close enough to keep them from getting into the door. But he, he did not let, Deputy Bragg had to be let in through another door. And I think it's interesting that Ms. Allaway was the one who let him in without protest. She took off the plastic and the tape. The other thing that I want to, I want to stress, and this is, this one is on me. You need to look at the video maybe a number of times. I apparently didn't the first time take a really good look at it because you'll see in footnote, on page 13 of my brief, footnote 13, I say if you look at 48 at the tape, that you'll see a curtain and it's open. I think that's a window curtain. With the help of Dave Wagner and the appellate unit, we looked at this about 20 times. And you have to look at it a number of times, the tape, because if you can get disoriented, because it's a little shaky, the, the, it's dark. But if you play that over and over enough times, you'll see one key factor here, which is there is no curtain between those two doors. You can see straight in. At 312 on that video, you can see it's, it's from the view of the doorway from, between the kitchen, from the kitchen side. And then at 948, you see it from the other side. And then at 2345, you again see it from the kitchen side. And you can see without a question, there is no curtain, there is no rod. You can see right straight through. So even if the guns were in the, in the living room somewhere, there doesn't seem to be anywhere that, that, that you couldn't have seen them. But his testimony was clear and it was a proposed finding that those were by the door near this refrigerator. So the other thing too is, is that, and we, we, we noted that the, the Judge Sachs said, no, I don't interpret her consent to mean that they could just search wherever they wanted, but certainly would have extended to the kitchen, any adjoining area where a interview might have taken place. Because their purpose there was to protect, their purpose was to protect the social worker. We have two individuals, both convicted felons, who are, they, they've received allegations of verbal abuse, guns in the house, meth, possible meth distribute, distribution. So naturally, they're going to be there to protect the individual. That doesn't mean that they can rummage around. There was testimony that defect, detective, Deputy Bragg was looking at outbuildings or whatever, should have been doing that. But that's not part of this case. Um, basically what we had is we did have a testimony from both officers as to where those guns were. We had a finding by the magistrate. This doesn't have to be remanded. It's a clear finding adopted by Judge Sachs. A lot of times, a lot of times district court judges will simply rubber stamp the decisions. There's a seven page ruling in this case of explaining why he believed that the testimony was credible. And one of the things he said was in the report that the Deputy Coach, uh, Kochenour wrote, he indicated where he found the guns and everything. But you don't have to wait for the report. You can look at the videotape and on the videotape, he's not only telling the prosecutor where he found them, he's telling this alleyway where he found them, that he found them in plain view. And she's not saying, that's not where you found them. She's not complaining when, when they go into a room. She's not complaining, hey, you shouldn't be there. At one point he says, do you have a light? And she turns on the light. So she's clearly acquiescing to their presence. So those of you who are familiar with a lot of drug raids and you've seen shields and battering rams and whatever, this is the most laid back interview you've ever seen. I mean, these, you'd think these were old friends talking. I mean, at one point when he tells her, uh, that he's going to get the feds involved and she's like, oh, it means we're going to jail. But the rest of the time, it's very friendly. She's trying to control the dogs so the other deputy could get into the house. There's no coercion. There's no nothing. At no point does she say, hey, you shouldn't be in this room or you shouldn't be in that room. She seems fine with whatever it is they're doing. And again, remember, even though he's saying that she didn't authorize, she testified that she did. The difference was she said, I said that they were, should be, should remain in the kitchen and you can't see anything. You couldn't have seen the guns from the kitchen. That's where the dispute is. And again, when you realize, when you look at the video and you see there's no curtain and you see that you can see straight in, it's like, why would we believe anything she says if it's clear that there wasn't a curtain and it's clear that you can see into the living room? Um, so, um, I've got a lot of time left, but I don't know if there's much that I need to, uh, to say here unless there are any more questions. I think this is a, a credibility issue. Um, we don't necessarily rubber stamp credibility issues. I mean, there are ways, for example, if the video, if the video showed that the guns were not where we said they were, that I think would be a problem. But that's the other thing I was going to mention. He says you don't see the guns. You actually do. You see mostly the barrels of the guns and you see him, Deputy Kochenour, getting them from, he got a couple from the, the, the, the bedroom that's, that's cordoned off by some sort of a banner and you see him getting them from the kitchen. Now that doesn't prove where they were initially because they could have been moved. We, we, we recognize that. But you do see the guns and you do see him get several of them from the doorway to the kitchen and take them out. Um, so they are visible. But again, the testimony was clear and straightforward that those guns were by the door that was adopted as a credibility finding or a proposed finding by the magistrate and Judge Sachs adopted it. So I don't, there's no need for a remand. It's clear what the, what the district court found in this case. Thank you, Your Honor. Oh, I was going to say one other thing. There's a footnote in my briefer. Did I already mention that? Where I got it wrong. It paid, I, I, I listed a 48 and I don't know what curtain that was, but that's not a curtain to the door. So I was wrong. Just a moment, Mr. Gibson. Oh, I'm sorry. Hold half a side. All right. We'll hear about it now. Thank you, Your Honor. I wanted to point out that Mr. Coffey, I think misspoke when he said that the magistrate found that the guns were in the kitchen, the entirety of his finding in that regard is paragraph 10 in the second page of his report where he says, upon entering the house, Deputy Kochenour observed multiple rifles, in parentheses, long guns leaned up against the door. It doesn't say anything about a refrigerator, doesn't say kitchen or living room. So that's really unclear. What room did, what, into what room did the people enter? They came in through the, what they call a mud room, which is a little porch where farmers clean the mud off of their boots coming out of the fields. And that is a little foyer and then it goes right into the kitchen. So it's unclear from that. It could have been the mud room, could have been the kitchen, could have been the living room. But there was no specific finding on that. I also disagree with, I probably may not have reviewed the footage from the body cam as recently as Mr. Coffey, but my recollection is there is a curtain that was open at the time the dash cam was turned on. But you have to keep in mind that by that time, they'd already been in the house for 30 minutes or so, and the deputy had already been in the living room. He even went into the bedroom, which was on the other side of the living room from the kitchen, and seized a couple of guns out of the bedroom. And the guns, Deputy Kochenour testified that he seized the guns, he examined them to see if they were still loaded, or if they were loaded and handled them. And so by the time he turned on his dash cam, or not his dash cam, his body cam, the guns had been moved from where the original location was. So I don't think that really conclusively determines anything. But it's just, this is a situation where I think there were just acts that were not addressed that could have undermined the credibility of the officer and bolstered my client's credibility that just were not made. And it's, I think, a clear situation where the officer's failure to do the, to turn on the body cam was really a glaring and probably maybe the most significant issue that I think had to be addressed to determine whether these officers' accounts of what happened were true. And the failure of the courts below to do that, I think, is, cannot be reconciled with a reviewing court's duty in a Fourth Amendment case involving the scope of consent to consider the totality of the circumstances. Um, one other issue that I didn't really get to address very much, and I know that the issue of a pretextual motives of officers usually see that a lot in, where they pull over automobiles for traffic violations, when really what they want to do is to investigate for a more serious crime. And most of the law says that that's okay, as long as they had a legitimate reason to do it. The old non-functioning taillight or the expired tags, things of that nature. But I think in the context of a search and consent, I think that it should be relevant because it is a part of the totality of the circumstances. It's clear that leaving a Nottoway County without any deputies on duty in a county of almost 900 square miles and why it was necessary for both deputies to accompany this social worker clearly indicates what they were up to, was to try to find a way to find some guns or drugs and arrest my client and her husband. And the body cam was not turned on until after my client was already placed under arrest, and she let the other deputy in after she was under arrest. So I don't think the issue of letting deputy Bragg in is really relevant. But I know I'm out of time, but I would respectfully request that the court reverse the district court. Thank you. Very well. Thank you to both counsel. The case is submitted. The court will file a decision in due course. Counsel are excused.